**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH ESTEY, Individually and On Behalf of All Others Similarly Situated,    )<br>)<br>)<br>Plaintiff,    )<br>)<br>v.    )<br>)<br>MERRILL LYNCH & CO., INC., MERRILL )<br>LYNCH & CO., INC. PLAN )<br>"INVESTMENT COMMITTEE," MERRILL )<br>LYNCH & CO., INC. PLAN )<br>ADMINISTRATIVE COMMITTEE, )<br>MERRILL LYNCH & CO., INC. )<br>MANAGEMENT DEVELOPMENT AND )<br>COMPENSATION COMMITTEE, LOUIS )<br>DIMARIA, E. STANLEY O'NEAL, )<br>ALBERTO CRIBIORE, ARMANDO M. )<br>CODINA, VIRGIS W. COLBERT, JOHN D. )<br>FINNEGAN, AULANA L. PETERS and )<br>JOHN DOES 1-10, )<br>)<br>Defendants.    ) | **CIVIL ACTION NO**. 07-CV-10268(DC)<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elizabeth Estey ("Plaintiff"), a participant in the Merrill Lynch & Co., Inc. 401(k) Savings and Investment Plan ("401(k) Plan"), Retirement Accumulation Plan ("RAP") and Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plans") during the proposed Class Period (defined below), alleges as follows on behalf of the Plans, herself and a class of all others similarly situated:

**INTRODUCTION**

1.     This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

2.      Plaintiff was employed with Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company") and was a participant in the Plans during the Class Period, during which time the Plans held interests in the Company's common stock.  Plaintiff's retirement investment portfolio in the Plans during the Class Period included Merrill Lynch stock.

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio.  Common stock of Merrill Lynch was one of the investment alternatives of the Plan throughout the Class Period.

4.      Plaintiff alleges that Defendants, as "fiduciaries" of the Plans as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to him and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plans' heavy holdings of Merrill Lynch stock.

5.      Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plans and proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) continuing to offer Merrill Lynch common stock as a Plan investment option for participant contributions when it was imprudent to do so; and (2) maintaining the Plans' pre-existing heavy investment in Merrill Lynch equity when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.      Plaintiff's Count II alleges that certain Defendants failed to communicate to the Plans' participants complete and accurate information regarding the Plans' investment in Merrill

Lynch securities sufficient enough to advise participants of the true risks of investing their retirement savings in Company stock.

7.     Plaintiff's Count III alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plans' and their participants' best interests in mind.

8.     Plaintiff's Count IV alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Merrill Lynch stock as an investment option and investing Plan assets in Merrill Lynch stock when it was no longer prudent to do so.

9.     Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plans' assets in Merrill Lynch equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained in detail below, among other things, (a) the Company's failure to disclose material adverse facts about its financial well-being, business relationships and prospects; (b) the foreseeable deleterious consequences to the Company resulting from its substantial entrenchment in the subprime mortgage market; (c) the fact that, as a consequence of the above, the Company's stock price was artificially inflated; and (d) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.

10.     This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiff's claims apply to the Plans, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plans-wide relief from breaches of fiduciary duty such as those

alleged herein, Plaintiff brings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

13.     More specifically, this district is an appropriate venue for this action because, on a recent Form 5500 annual filing with the Internal Revenue Service and Department of Labor, the address listed for the sponsor of each of the Plans is in this district.  In addition, the principal executive offices of Defendant Merrill Lynch are located in this district.  Accordingly, it is likely that many of the parties and potential witnesses, including corporate executives and many of the Plans' participants, are located in or within close proximity to this district.

## PARTIES

### Plaintiff

14.     Plaintiff Elizabeth Estey is a "participant," within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), in the 401(k) Plan, the RAP and the ESOP and held Merrill Lynch shares in her retirement investment portfolio during the Class Period.

### Defendants

**Merrill Lynch**

15.     Defendant Merrill Lynch is a Delaware corporation with its principal place of business located at 4 World Financial Center, New York, N.Y. 10080.  Merrill Lynch, through its subsidiaries, offers capital market services, investment banking and advisory services, wealth management, insurance, banking and related products and services on a global basis.

16.     Merrill Lynch is the named Plan Sponsor for each of the Plans.  *See* IRS and DOL Form 5500 filings for the year 2005.  Further, the Company exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, and was therefore a fiduciary of the Plans in its own right.  Merrill Lynch acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

17.     Merrill Lynch had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plans-related activities.  Through its Board of Directors or otherwise, Merrill Lynch had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plans.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plans, its participants and their beneficiaries.   Accordingly, the actions of the Board of Directors, the Plans' administrative, compensation and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

18.     The Company and its Board of Directors (the "Board") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.  Indicative of the Board's authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plans, appointing, monitoring and removing members of Committees charged with the operation of the Plans, and for determining the amount, if any, of any additional discretionary

contributions by the Company to the Plans.  Upon information and belief, the Board also had the authority and obligation to appoint and remove other fiduciaries of the Plans, including, without limitation, members of the Plans' Investment Committee and Administrative Committee, if necessary in order to best serve the interests of the Plans' participants.

**Investment Committee Defendants**

19.    The Investment Committee consists of a group of senior executives, excluding any directors or executive officers.  The Investment Committee has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds.  *See* Securities and Exchange Commission Form 11-K for the fiscal year ended December 31, 2006 ("2006 11-K").

20.    The Investment Committee is delegated responsibility for the selection of Investment Funds for the Plans and monitoring the performance of the Investment Funds and is, upon information and belief, likely a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.

21.    The Investment Committee, charged with the selection of the Plans' investment options, has wielded its fiduciary power a number of times with respect to the investment make up of the Plan.  For example, in 2005, the Investment Committee changed the money market fund from the Merrill Lynch Reserves Money Fund to the Merrill Lynch Premier Institutional Fund.  2006 11-K.

22.    The Investment Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Administrative Committee Defendants**

23.    Upon information and belief, the Administrative Committee was appointed by the Board and charged with managing the operation and administration of the Plans.  2006 11-K.

24.     The Administrative Committee also signed the 2006 11-K.  Upon information and belief, the Administrative Committee is likely a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.

25.     The Administrative Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

26.     Defendant Louis DiMaria served as the Chairman of the Administrative Committee during the Class Period.  Defendant DiMaria signed the 2006 11-K as the "Chairman of the Administrative Committee of the Merrill Lynch & Co., Inc. 401(k) Savings and Investment Plan."  Upon information and belief, the Administrative Committee was charged with the operation and administration of each of the Plans.  Defendant DiMaria was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Director Defendants**

**Chairman/CEO**

27.     Defendant E. Stanley O'Neal ("O'Neal") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period. Defendant O'Neal was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Management Development and Compensation Committee**

28.     According to its charter, the Management Development and Compensation Committee of the Board of Directors (the "Compensation Committee") has overall responsibility for executive succession planning, management development, and approving and evaluating

7

incentive compensation plans, policies and programs of the Company and its affiliates.  Upon information and belief, the Compensation Committee was responsible for appointing, monitoring and removing members of Plan Committees charged with the operation of the Plan, including, without limitation, the Investment Committee and the Administrative Committee.

29.     The Compensation Committee is required by its charter to hold three meetings per year.

30.     According to the charter, the Compensation Committee:

- May review overall policy regarding compensation and benefit programs that re generally available to employees and make such recommendations as it deems appropriate with respect to such programs;

- Shall review and approve changes to benefit plans that result in the issuance of stock or in a material change to the benefits being provided to employees.  For these purposes, material change shall mean any change that results in an expense of an expense reduction representing 10% or more of the Company's total employee benefit plan costs or fundamentally alters the nature of the benefits provided by the plan; and

- Shall exercise any duties and responsibilities that are delegated to the Board or a committee of the Board by any retirement or benefit plan documents and shall have the power to delegate such duties to an appropriate officer of the Company.

31.     The members of the Compensation Committee are appointed by the Board on the recommendation of the Nominating and Corporate Governance Committee.  The members of the Committee may be removed or replaced by the Board at any time.

32.     Defendant Alberto Cribiore ("Cribiore") served as a member of the Compensation Committee during the relevant time period. Defendant Cribiore was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

33.     Defendant Armando M. Codina ("Codina") served as a member of the Compensation Committee during the relevant time period. Defendant Codina was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

34.     Defendant Virgis W. Colbert ("Colbert") served as a member of the Compensation Committee during the relevant time period. Defendant Colbert was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

35.     Defendant John D. Finnegan ("Finnegan") served as a member of the Compensation Committee (as well as its chair) during the relevant time period. Defendant Cribiore was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

36.     Defendant Aulana L. Peters ("Peters") served as a member of the Compensation Committee during the relevant time period. Defendant Peters was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

37.     Defendants O'Neal, Cribiore, Codina, Colbert, Finnegan and Peters are hereinafter collectively referred to as the "Director Defendants."

**Additional "John Doe" Defendants**

38.     Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Administrative and/or Investment Committees, as well as Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.  The identities

of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## THE PLANS

39.     The Plans are "employee pension benefit plans," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The relief requested in this action is for the benefit of the Plans and their participants/beneficiaries.

**401(k) Savings & Investment Plan**

40.     Specifically, the 401(k) Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), and its stated purpose is "to encourage employees to save for retirement."  *See* 2006 11-K.[1]  The Plan includes the Savings and Investment Plan ("SIP"), Vocon and Deferred Profit Sharing Accounts.[2]

41.     Employees are eligible to participate in the SIP at commencement of employment.

42.     The SIP was adopted and commenced activities in 1987.

43.     Individual accounts are maintained for each SIP participant.  Each participant's account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

44.     The trustee of the 401(k) Plan is Merrill Lynch Trust Company, FSB (the "Trustee"), a federally chartered savings bank affiliated with the Company.

45.     Common collective trust funds are maintained by Merrill Lynch Bank USA, an affiliate of the Company, and sub-advised by Merrill Lynch Investment managers L.P. (also an affiliate of the Company).

46.     State Street Bank and Trust Company ("State Street") is the pricing administrator

---

[1] The information contained in this section is taken from the 2006 11-K, unless otherwise indicated.

[2] The Vocon Accounts were established under the Pension Plan for Employees of Merrill Lynch & Co., Inc. and Affiliated.  These accounts represent the contributory portion of the former pension plan.  These after-tax employee contributions were suspended as of December 1986.  The Deferred Profit Sharing Accounts were originally established as the Deferred Profit Sharing Plan for Employees of Merrill Lynch, Pierce, Fenner and Smith, Inc. and Affiliates.  The purpose of this account was to enable employees to participate in the profits of MLPF&S.  Employer contributions were suspended as of December 1973.

for the funds.

47.     All contributions to the SIP may be allocated among any of the available investments selected by the participant from among the investments designated by the Investment Committee.

48.     As of December 31, 2006, there were 33 investment options in the 401(k) Savings & Investment Plan.

Participant Contributions

49.     Each participant may elect to make contributions to the SIP on a pre-tax basis through payroll deductions from 1% through 25% of such participant's eligible compensation (as defined in the SIP document) for each pay period up to an annual maximum of $15,000 for 2006.

50.     In addition, participants who are age 50 or older and have made the maximum contribution to the SIP, can make an additional catch-up contribution to the SIP through payroll deductions from 1% to 23% of eligible compensation to an annual maximum of $5,000.   A participant can elect to change the rate at which his/her contribution is determined at any time during the year.

51.     Beginning January 1, 2005, employees may elect to contribute up to 25% of eligible compensation in after-tax dollars up to an annual maximum of $10,000.

52.     Participants are always 100% vested in contributions to the SIP made from their eligible compensation and in amounts rolled over from a former employer's qualified retirement SIP or transfer from another SIP, and in the earnings thereon.

Company Contributions

53.     Prior to January 1, 2007, the Company matched one-half of the first 6% of eligible compensation that the employee contributed, up to an annual maximum Company contribution of $2,000, after one year of service.

54.     Effective January 1, 2007, the Company matches 100% of the first 4% of each participant's eligible compensation contributed to the SIP, up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000, after one year of service.  For

employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution remains $2,000.

55.     Participants become vested in Company contributions and earnings thereon based on completed years of service, as follows:

| YEARS OF SERVICE | VESTED INTEREST |
|:---:|:---:|
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 | 100% |

56.     Participants also become 100% vested in Company contributions when they attain age 65 or terminate employment as a result of death.   Participants are 100% vested in the dividends paid on Company common stock regardless of their years of service.

57.     As of year end 2006, the 401(k) Plan held 16,415,773 shares of Merrill Lynch Common Stock, valued at $1,528,308,452.   Therefore, the Plan and its participants have suffered significant losses due to the breaches described herein.

**Retirement Accumulation Plan & Employee Stock Ownership Plan**

58.     The Company "established the RAP and the ESOP, collectively known as the 'Retirement Program', for the benefit of employees with a minimum of one year of service. A notional retirement account is maintained for each participant."   2006 Merrill Lynch Annual Report, p. 116.

59.     The Company created the ESOP and RAP after terminating the Pension Plan for

the Employees of Merrill Lynch & Co. in 1988.  *See* 2006 RAP 5500, n. 1; 2006 ESOP 5500, n. 1 (defined below).  Participants do not contribute any portion of their salary or other compensation into either the RAP or ESOP; contributions are made by the Company and/or through release of unallocated ESOP Merrill Lynch common stock shares.

RAP

60.     The RAP is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), established for eligible employees of Merrill Lynch and its affiliates. Effective May 8, 2003, the Company designated the portion of the RAP invested in company stock as an employee stock ownership plan.  *See* Notes to Financial Statements, RAP Plan Year 2006, Form 5500 Annual Report to the Internal Revenue Service and Department of Labor ("2006 RAP 5500"), n. 1.

61.     Individual notional accounts are maintained for each Plan participant.  RAP participants receive an annual contribution from Merrill Lynch credited to their notional accounts.  Contributions are equal to a percentage of maximum annual eligible compensation. The percentage represents the total basic credits earned by the participant.  Basic credits are based upon eligible compensation and years of service and range from two percent for less than five years of service to eight percent for 30 or more years of service.

62.     Under the RAP, employees direct the investment of the Plan's assets among different investment alternatives, including Company common stock, designated as plan investment vehicles by the Investment Committee.

63.     Prior to January 2007, participants became 100% vested in their account balances upon the earlier of completing five years of service or reaching normal retirement age.  Effective January 2007, participants become 100% vested after completing three years of service.

64.     As of December 31, 2006, the RAP held 12,131,023 shares of Company stock valued at $1,129,398,218.  2006 RAP 5500, Schedule H, Part IV.

65.     Upon information and belief, each and every participant of the RAP had Company stock in their Plan account during the Class Period.  As a result, a substantial portion

of the Plan's assets are invested in Company stock.

ESOP

66.     Like the RAP, the ESOP maintains a separate notional account for each participant.

67.     Participants receive annual allocations of shares of shares of the Company common stock.  Allocations are based upon each participant's receipt of Basic Credits under the RAP, multiplied by a fraction, the numerator of which is the fair market value of the shares released and the denominator of which is the total Basic Credits made on behalf of all participants for the year.  Notes to Financial Statements, ESOP Plan Year 2006, Form 5500 Annual Report to the Internal Revenue Service and Department of Labor ("2006 ESOP 5500").

68.     Thus, under the ESOP, all contributions to participants' retirement savings are automatically invested in Merrill Lynch common stock.  Through Plan Year 2006, participants with five years of Company could diversify their ESOP investments either by (1) withdrawing their account balance or (2) rolling it over into their RAP accounts where they could continue to hold their ESOP-derived stock or diversify the proceeds of selling the shares into other RAP investment alternatives. *See* 2006 ESOP 5500, p. 5.

69.     As of December 31, 2006, the ESOP held shares of Company stock valued at $2,098,534,908.  2006 ESOP 5500, Schedule H, Part IV.

70.     Each and every participant of the ESOP had Company stock in their Plan account during the Class Period.  As a result, a substantial portion of the Plan's assets are invested in Company stock.

## **CLASS ACTION ALLEGATIONS**

71.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plans,
> at any time between February 26, 2007 and the present (the "Class

Period") and whose Plan accounts included investments in Merrill Lynch stock.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plans accounts included investment in Merrill Lynch stock.[3]

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)     whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;

    (b)     whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;

    (c)     whether Defendants violated ERISA; and

    (d)     whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

74.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the

---

[3] *E.g.*, the 401(k) Plan's Form 5500 for Plan year 2005 indicates that, at the beginning of that year, the 401(k) Plan (the SIP alone) had approximately 54,325 participants.

Class.

76.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

77.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

78.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

79.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

80.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."   § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Upon information and belief, the Company, the Board and the Plans Committees were named fiduciaries of the Plans.

81.     Instead of delegating fiduciary responsibility for the Plan to external service providers, Merrill Lynch chose to internalize at least certain aspects of this fiduciary function.

82.     Upon information and belief, the Company administered the Plans and the Plans' assets through the Board, the Board's Compensation Committee, the Investment Committee and the Administrative Committee, which had discretionary authority to manage and control the operation and administration of the Plans and investment of their assets, as noted and described

above.  The Company, through the Board, specifically, the Compensation Committee, which was itself monitored/evaluated by the Board Chairman, was, upon information and belief, responsible for appointing, evaluating and monitoring the Plans' committees, including, without limitation, the Investment Committee and Administrative Committee, including their members and delegees.

### Additional Fiduciary Aspects of Defendants' Actions/Inactions

83.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

84.    Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).  Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Jones v. Am. Gen. Life & Accident Ins. Co.,* 370 F.3d 1065, 1072 (11th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir.

1993).

85.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plans' participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and Prospectuses regarding Plans/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, Merrill Lynch's SEC filings were incorporated into and part of the SPDs, the Prospectus and/or the Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

86.     Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press,[4] concerning investment in company stock, including that:

(a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)     Out of loyalty, employees tend to invest in company stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

---

[4] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116  Q.  J.  Econ.  4,  1149  (2001)  (available  at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

87.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

## DEFENDANTS' CONDUCT

88.     Merrill Lynch is one of the world's largest wealth management, capital market and advisory companies, and one of the top investment banks in the United States.  As such, the Company is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes, and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.  S*ee* Merrill Lynch Form10-K for the year 2006 filed with the SEC on February 26, 2007 ("2006 10-K").

89.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants.  Although they knew or should have known that the Company's stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market, Defendants continuously reassured Plan participants and did nothing to protect the heavy investment of their retirement savings in Merrill Lynch stock.

## A.     The Subprime Mortgage Industry

90.     Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

91.     Typically, subprime borrowers have relatively low credit scores along with little or no money to apply to a down-payment on a home.  These individuals would usually be excluded from the mortgage market and, accordingly, would not have mortgages included in the secondary market.

92.     According to an article in *USA Today* on December 7, 2004, subprime mortgage lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay just the interest for a set number of years, or 80-20 loans, in which borrowers finance a home with an 80% mortgage at one rate and the remaining 20% through a second loan."  *USA Today*, "Subprime Loan Market Grows Despite Troubles," December 7, 2004.

93.     Subprime mortgage loans represent a greater risk to lenders than prime mortgage loans.  For example, one product marketed by some subprime lenders is a Pay Option ARM, which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually.  The borrower can choose from a variety of payment options, including one that is below what would be paid in an interest-only mortgage.  Selection of this option would result in negative amortization, meaning that the loan's principal would actually *increase* during this period.  Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made.  In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage.  The reversion to full amortization is referred to as a "reset" or "recast" and can result in a substantial increase in a borrower's monthly mortgage payment.  If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

94.     An additional product marketed by many subprime lenders is the 2/28 ARM,

which is an adjustable rate mortgage that fixes rates for two years, and then resets to an ARM rate index value (*e.g.* the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) after the two-year mark.  For example if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan.  As with the Pay Option ARM discussed above, if borrowers are unable to refinance the loan and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

95.     Rather than hold mortgage loans, generally, lenders sell subprime mortgages bundled into bonds and offered to individual and institutional investors.  Merrill Lynch became interested in subprime mortgage lenders because they helped to substantially increase the pipeline of mortgage-backed securities.  *See, e.g. The New York Times*, "Tremors at the Door," January 26, 2007.

96.     As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans.  Too often, this had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans.  In other words, many lenders became less concerned with borrowers' ability to repay over the long term and more concerned with their mere volume of loans over the short term.  This is because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed.  As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

97.     Thus, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well.  For example, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006, as reflected in the chart below:



Source: *The New York Times*, "Tremors at the Door," January 26, 2007.

98.     The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market.  During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

**B.     Merrill Lynch Gambled on the Subprime Market**

99.     Generally speaking, a collateralized debt obligation ("CDO") is a security backed by a pool of bonds, loans and other assets.  Merrill Lynch was/is deeply entrenched in investments in the subprime mortgage market, including CDOs and other mortgage-backed securities.  Further, Merrill Lynch has been the largest underwriter of CDOs, as a result of an aggressive marketing effort and a commitment to investing in the subprime mortgage market.  For example, in 2005, its underwriting total rose to $35 billion, $14 billion of which was backed primarily by securities tied to subprime mortgages.

100.    Despite the fact that most investment banks recognized warning signs and reduced their exposure to CDOs, Merrill Lynch inexplicably chose to charge forward and *increase* its entrenchment in the subprime mortgage market.  In 2006, Merrill Lynch's

underwriting of subprime CDOs soared from **$14 billion** to a whopping **$44 billion**.  Merrill Lynch relentlessly continued to push these CDO deals throughout 2007.

101.    Thus, when the subprime mortgage market collapsed, Merrill Lynch found itself trapped with billions of dollars of debt that it simply could not resell—investors were not interested.  Further, Merrill Lynch suffered more than a number of other large brokerage firms, because of their deeper investments in subprime mortgages.  *See NPR.org*, "Merrill Lynch Outlook Grim from Credit Crisis," October 24, 2007.

102.    Certain of Defendants had a clear conflict of interest, as their compensation was tied to the Company's performance.  Between 2006 and mid-2007, Merrill Lynch earned $800 million as the lead underwriter on 136 CDO deals with a dollar value of $93 billion.

103.    Thus, despite the fact that they knew or should have known that Merrill Lynch's heavy involvement in the CDO market would lead to a substantial devaluation of the Company's stock once the truth became known, certain of Defendants had a very strong financial incentive to conceal the truth and keep the Company's stock price artificially high and write-downs for subprime losses artificially low.

C.    **During the Class Period, Merrill Lynch Disseminated Materially Inaccurate, Incomplete and Misleading Information to Plan participants**

104.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plans' participants, particularly regarding the following:  (1) that the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry deteriorated; (2) that the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (3) that the Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; (4) that the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

105.    Merrill  Lynch's  dissemination  of  inaccurate,  incomplete  and  materially

misleading statements prevented the market from realistically assessing Merrill Lynch and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock. Defendants further knew or should have known that the Company's stock price would plummet—and that Plan participants would suffer tremendously and unnecessarily—once the foreboding truth became known.

106.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and Plan participants that Merrill Lynch would not fall prey to adverse trends in the credit industry—particularly, the subprime mortgage industry.

107.    For example, on February 26, 2007, the first day of the Class Period, Merrill Lynch filed its annual report on Form 10-K for the fiscal year 2006, which included results for the fourth quarter and full year 2006 ("2006 10-K").  In the report, the Company touted its decision to acquire from National City Mortgage First Franklin Financial Corp. ("First Franklin").  First Franklin was one of the nation's largest originators of subprime mortgage loans.   Merrill Lynch described the acquisition as a strategic transaction that would provide additional sources of origination and servicing for its subprime mortgage-backed securitization and trading platform.

108.    In other words, as many other lenders were going out of business or taking losses that they were not expecting, Merrill Lynch announced confidence in its performance and stated that it was moving deeper still into the murky mire of the subprime mortgage industry.

109.    On April 19, 2007, Merrill Lynch issued its financial results for the first quarter of 2007, reporting strong growth in net earnings, with net revenues up 24% from the prior year period and up 14% from the fourth quarter of 2006.  The Company boasted that it had posted the second highest quarterly revenue in its history.  Defendant O'Neal reassured that, "This was a terrific quarter.  In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders."

110.    By the end of April 2007, Merrill Lynch stock was trading above $90 per share.

111.    During a conference in London during June 2007, Defendant O'Neal again

reassured that problems in the subprime area were "reasonably well contained."  O'Neal added that, "There have been no clear signs it's spilling over into other subsets of the bond market, the fixed-income and the credit market."

112.    On July 17, 2007, Merrill Lynch announced its financial results for the second quarter of 2007, reporting "very strong net earnings, net revenues and net earnings per diluted share."   Among a cacophony of concerns regarding the collapse of the subprime mortgage market, the Company continued to conceal the truth regarding its true financial condition.  In the Company's July 17, 2007 press release, O'Neal boasted, "We delivered another strong quarter in a volatile and, sometimes, hostile market environment."  The Company touted its "revenue diversification" and "strong performance despite uneven market conditions."

113.    Throughout autumn 2007, the stock prices of many large lenders dropped significantly.  This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges.  Nevertheless—and despite Plan participants' heavy investment in Company stock—Merrill Lynch stubbornly stood its ground and continued to hide the truth about its financial condition.

**The Truth Finally Begins to Emerge**

114.    On  September 17, 2007, Merrill Lynch announced that First Franklin—the large, subprime originator that it had recently acquired—would cut an unspecified number of jobs amid the subprime mortgage meltdown.  Upon this news, Merrill Lynch shares dropped 2.3% in the market, down to at least $72.91.

115.    Finally, on October 5, 2007, Merrill Lynch announced write-downs of an estimated $4.5 billion, "related to incremental third quarter market impact on the value of CDOs and subprime mortgages."  Further, the Company indicated that, despite market expectations of an increase as high as $2.00 per share, it expected to lose as much as $0.50 per share.  Despite the markedly unpleasant report, the Company continued to conceal the truth and, instead, reassure the market.  O'Neal stated, "We can do a better job in managing this risk, as we have

done with other asset classes, including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities."

116.   Then, on October 24, 2007, Merrill Lynch reported "a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006." Further, Merrill Lynch announced that its actual losses from the devastating debacle commonly known as the collapse of the subprime mortgage market amounted to $7.9 billion. The total hit for Merrill Lynch was reported as approximately $8.4 billion.

117.   Further, on October 24, 2007, the Company revealed that "net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent." The Company also announced a loss of $2.2 billion, or $2.85 per share, for the quarter, nearly six times the loss Merrill Lynch had predicted only three weeks earlier.

118.   In a conference call to investors, O'Neal admitted, "It turned out our assessment of the potential risk and mitigation strategies were inadequate." O'Neal finally admitted, "The market environment has shown renewed signs of volatility and weakness, as shown by recent downgrades on thousands of mortgage securities by rating agencies."

119.   Upon this news, the value of Merrill Lynch stock fell from $67.12 per share to as low as $61.40 per share, amid trading volume of 52 million shares.

120.   Analysts were, unsurprisingly, homogenously unimpressed. For instance, DRBS analysts reasoned, "These losses are relatively larger than those reported previously by other broker dealers and universal banks that have already reported. Merrill appears to have been much more exposed in its securitization businesses." *See MarketWatch.com*, "Merrill Swings to Loss on Huge Mortgage Hit" (October 24, 2007).

121.   Any drop in Merrill Lynch's ratings was a crippling event for the investment bank. As a result of the massive October write-off, closely-followed rating agencies such as

Fitch, Moody's and Standard & Poor's unanimously downgraded Merrill Lynch's credit ratings. For instance, on October 25, 2007, S&P reduced Merrill's credit rating to negative after the Company reported its largest quarterly loss in history.  S&P downgraded Merrill Lynch on write-down it labeled "staggering."

122.    At least as early as October 30, 2007, reports surfaced that Merrill Lynch Chief Financial Officer ("CFO") Jeffrey Edwards had offered to resign his position with the Company.

123.    On October 30, 2007, Merrill Lynch ousted its O'Neal, its Chairman and CEO, one of the primary proponents of its surge into the CDO market, **after the firm lost more than $2 billion in the third quarter**.

124.    Upon this news, Merrill Lynch's stock dropped 3 percent, to close at $66.42.

125.     On November 2, 2007, the last day of the Class Period, a report surfaced, indicating that Merrill Lynch dealt with hedge funds to delay recording losses on mortgage-backed securities.  *See WSJ.com*, "Deals With Hedge Funds May be Helping Merrill Delay Mortgage       Losses,"       November       3,       2007,       article       available       at: http://online.wsj.com/public/article_print/SB119396956371280131.html, accessed on November 2, 2007 ("Hedge Funds Article").

126.    For example, according to the Wall Street Journal:

> In one deal, a hedge fund bought $1 billion in commercial paper issued by a Merrill-related entity containing mortgages, a person close to the situation said. In exchange, the hedge fund had the right to sell back the commercial paper to Merrill itself after one year for a guaranteed minimum return, this person said.

127.    Thus, upon information and belief, Merrill Lynch—despite the heavy investment of its Plans' participants in Company stock and despite its knowledge of the inevitable losses related to the subprime mortgage market—the Company continued its creative charade by soliciting and entering into sham "sales" of its CDOs, whereby it would "sell" commercial paper to hedge funds, but, in reality, retain the actual credit risk by agreeing to buy back the commercial paper for a guaranteed minimum.  Thus, all Merrill Lynch was accomplishing was

an intentional, surreptitious delay of its credit risk, rather than an actual sale.  In such a sham transaction, no actual risk passes to the buyer; however, the transaction has the fleeting effect of seemingly improving the seller's books by relieving the firm of the need to write down the value of the securities involved.  As of November 2, 2007, all that Merrill Lynch had to say for itself was that it "does not comment on specific transactions."  *Id*.

128.   Despite Merrill Lynch's lack of comment, Janet Tavakoli, a consultant for derivative investors stated that, "Merrill has been making the rounds asking hedge funds to engage in one-year off-balance-sheet credit facilities.  One fund claimed that Merrill was offering a floor return (set buy-back price), so this risk would return to Merrill."  Further, Ms. Tavakoli agreed that such transactions would explain how Merrill's mortgage-related exposure dropped in the third quarter of 2007.  *Id*.

129.   On November 7, 2007, Merrill Lynch acknowledged that the SEC was investigating matters relating to its subprime mortgage holdings.  Further, on November 7, 2007, Merrill Lynch revealed that its exposure to CDOs was greater than previously reported.  Merrill Lynch revealed that its exposure to CDOs was $15.82 billion--$600 million more than reported in its earnings release on October 24, 2007.

130.   On February 26, 2007 (the beginning of the Class Period), Merrill Lynch stock closed at $86.66 per share and reached a Class Period high close of $94.17 per share on May 18, 2007 as a result of Defendants' concealment of the truth regarding the Company's artificially inflated revenues and its failure to accurately report its true financial condition.

131.   However, once the truth emerged, Plan participants suffered drastically as Merrill Lynch's stock price plunged.  On November 2, 2007, after shares of Merrill Lynch had dropped 7.90% for the day, to $57.28 per share, the Company's stock had suffered **a 34% drop from the beginning of the Class Period**.  This drop, especially given the Plans' enormous investment of the Plans' participants' retirement savings in Merrill Lynch stock, caused at least hundreds of millions in losses to the Plans and the Class.

**D**.   **Defendants Knew or Should Have Known That Merrill Lynch Stock Was An Imprudent Investment For The Plan, Yet Mislead Plan Participants.**

132.    During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.  For example:

> In mid-July, before the credit crunch worsened, Merrill reported better-than-expected earnings with little impact from exposure to mortgage-backed securities. Asked about the firm's mortgage position on a call with analysts, Merrill Chief Financial Officer Jeff Edwards said: "Proactive aggressive risk management has put us in an exceptionally good position." Two weeks later, Mr. O'Neal **personally** sent an email to Merrill employees **assuring** them the firm had such risks well in hand.

*Id* (emphasis added).

133.    As a result of the enormous erosion of the value of Company stock, the Plans' participants, the retirement savings of whom was heavily invested in Merrill Lynch stock, suffered unnecessary and unacceptable losses.

134.    At all relevant times, Defendants knew or should have known that Merrill Lynch stock was an imprudent investment for the Plans as a result of the risks to the Company's financial well-being and prospects due to the inherent risks associated with Merrill Lynch: (a) placing such a heavy "bet" in the subprime lending market, through CDOs and otherwise; (b) failing to properly report estimated losses; and (c) surreptitiously attempting to conceal losses associated with the subprime meltdown by entering into off-balance sheet arrangements with hedge funds.

135.    Through their high ranking positions within the Company - especially the Director Defendants, Defendants knew or should have known of the existence of the above-mentioned problems.

136.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans'

participants regarding the Plans' investment in Merrill Lynch stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

137.   In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Merrill Lynch stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Merrill Lynch's deep-rooted problems so that participants could make informed decisions regarding whether to include Merrill Lynch stock in the Plans.

138.   An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Merrill Lynch stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

139.   Because Defendants knew or should have known that Merrill Lynch was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Merrill Lynch stock.

140.   Defendants had available to them several different options for satisfying this duty, including, but not limited to: making appropriate public disclosures as necessary; divesting the Plan of Merrill Lynch stock; discontinuing further contributions to and/or investment in Merrill Lynch stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Merrill Lynch they could not loyally serve the Plans and its participants in connection with the Plans' acquisition and holding of Merrill Lynch stock.

141.   Despite the availability of these and other options, Defendants failed to take any

action to protect participants from losses resulting from the Plans' investment in Merrill Lynch stock.  In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company Stock even as Merrill Lynch's problems came to light.

**E.      Defendants Regularly Communicated with the Plans' Participants Regarding Investments in Merrill Lynch Stock Yet Failed to Disclose the Imprudence of Plan Investment in Merrill Lynch Stock**

142.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company whose common stock was, one of, if not the, largest assets of each of the Plans.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

143.    The SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plans' participants to purchase, and to hold and maintain, investments in the Plans in Merrill Lynch stock.

144.    These statements, their related press releases, and substantially similar SEC filings and press releases issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plans' participants of the Company's ever-increasing problems with its key product lines, including loan defaults, liquidity concerns and shrinking demand.  These statements were made with the implicit knowledge that the Plans' participants would rely upon such information in determining whether to maintain investment in Merrill Lynch stock.

**F.      Defendants Suffered From Conflicts of Interest**

145.    Merrill Lynch's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' compensation was in the form of stock option awards.

146.    Because the compensation of at least several of the Defendants was significantly tied to the price of Merrill Lynch stock, Defendants had incentive to keep the Plans' assets heavily invested in Merrill Lynch stock on a regular, ongoing basis.  Elimination of Company stock as an investment option/vehicle for the Plans would have reduced the overall market demand for Merrill Lynch stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Merrill Lynch stock, resulting in reduced compensation for the Defendants.

147.    Some Defendants may have had no choice in tying their compensation to Merrill Lynch stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plans participants' and beneficiaries' retirement savings tied up to a large extent in Merrill Lynch stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

148.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and Beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## CLAIMS FOR RELIEF UNDER ERISA

149.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

150.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

151.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches

any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

152.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

153.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law."  They entail, among other things:

a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

154.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

155. Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plans' Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

156. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157. At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

158. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plans

were prudent and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

159.   A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

160.   Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plans as described herein. Investment in the Company stock during the Class Period clearly did not serve the Plans' purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

161.   The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

162.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and Beneficiaries, lost a significant portion of their retirement investment.

163.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II

**Failure to Provide Complete and Accurate Information
to the Plans' Participants and Beneficiaries by all Defendants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
405 of ERISA by the Company, Director Defendants and the Administrative Committee)**

164.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

165.     At all relevant times, as alleged above, the above-listed Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

166.     At all relevant times, the scope of the fiduciary responsibility of the above-listed Defendants included Plans-related communications and material disclosures.

167.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plans' investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.  This duty applies to all of the Plans' investment options, including investment in Company stock.

168.     These Defendants knew that investment in Company stock carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

169.    These Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook.  These failures were particularly devastating to the Plans and their participants— losses in this investment had an enormous impact on the value of participants' retirement assets.

170.    These actions and failures to act were uniform and caused the Plans, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company stock in the Plans at a time when these Defendants knew or should have known that the Plans' participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company stock.

171.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

172.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of the Plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company stock and were material to any reasonable person's decision about whether or not to invest or maintain

any part of their invested assets of the Plans in the Company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

173.    As a consequence of these Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

174.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

175.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

176.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

177.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

178.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make

independent judgments concerning the Plans' investments in Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

179.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

180.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count

## COUNT IV

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Merrill Lynch & Director Defendants)**

181.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

182.    At all relevant times, as alleged above, Merrill Lynch and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

183.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Merrill Lynch and the Director Defendants, including the Compensation Committee, included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Investment Committee, the Administrative Committee and other Plan Committees.

184.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Merrill Lynch and the Director Defendants, had the duty to:

(1)     Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(2)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(4)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(6)     Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.  The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

185.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

186.     Merrill Lynch and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries

completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  Merrill Lynch and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the Merrill Lynch stock fund as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plan in Merrill Lynch stock when it no longer was prudent to do so.  Despite this knowledge, Merrill Lynch and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

187.    In addition, Merrill Lynch and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Merrill Lynch that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

188.    Merrill Lynch and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

189.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

190.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## **CAUSATION**

191.   The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plans' participants.

192.   Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company stock as an investment vehicle.   As a consequence, participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

193.   Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

### REMEDY FOR BREACHES OF FIDUCIARY DUTY

194.   As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

195.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

196.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and

Beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

197.    Plaintiff, the Plans, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

198.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

### SECTION 404(c) DEFENSE INAPPLICABLE

199.    The Plans suffered losses, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plans were invested in Merrill Lynch Stock during the Class Period in violation of the Defendants' fiduciary duties.

200.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

201.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the

selection of imprudent investment options for the Plan.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.  In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

202.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Merrill Lynch stock in the Plan.  Accordingly, participants failed to exercise the requisite independent control over their investment in Merrill Lynch stock in the Plan.

203.    In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co*., 126 F.3d 1354, 1361 (11th Cir. 1997).

204.    The Defendants' liability to the Plans, Plaintiff and the Class for relief stemming from the Plans' imprudent investments in Merrill Lynch Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Merrill Lynch maintained by the Plans in proportion to the accounts' losses attributable to the decline in the stock price of Merrill Lynch;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H       An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.


DATED: November 9, 2007                 Respectfully submitted,


                                        By: _/s/ Wai Kin Chan_____
                                        Wai Kin Chan (WC-0743)
                                        **LAW OFFICES OF CURTIS V. TRINKO, LLP**
                                        16 West 46th Street, 7th Floor
                                        New York, New York 10036

Tel: (212) 490-9550
Fax: (212) 986-0158

**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Katherine B. Bornstein
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

**Attorneys for Plaintiff and Proposed Class**